[S. F. No. 4008. Department Two.—February 2, 1907.]

VINCENT NEALE, Special Administrator, etc., Appellant, v. ROBERT MORROW, Administrator, etc., Respondent.

MUTUAL LIFE INSURANCE COMPANY—GUARANTEE FUND—NOTES PAYABLE AFTER ACTUAL DEMAND—STATUTE OF LIMITATIONS.—A note given to a mutual life-insurance company incorporated under the act of April 2, 1866, as part of the guarantee fund required by that act, and which by the statute was not intended to be renewed every four years, and by its terms was payable to the order of the insurance company ''within five days after *actual demand,* with interest at the then legal rate from and after such demand,'' the obligation of which has never been discharged, is not subject to the operation

of the statute of limitations prior to the making of actual demand for payment by the lawful holder thereof.

ID.—CONSTRUCTION OF NOTE—MEANING OF WORDS—OBJECT AND CIRCUMSTANCES—STATUTE MADE PART OF IT.—Every word used in the note is to be given its full meaning and effect; and in ascertaining its meaning the object in view and the circumstances attending its execution are to be considered. The note having been given pursuant to the act under which the insurance company was organized, its provisions, in so far as they bear upon such note, must be considered as written into the note itself.

ID.—TIME OF DEMAND FIXED BY ACT—CONTINUING GUARANTEE FUND.— The act of incorporation, which is equal in dignity with the statute of limitations, limits the time within which a demand may be made for the payment of a guarantee note to the period before a fixed capital is obtained by the company, it being intended that such notes shall constitute a continuing guarantee fund, which was to remain intact for the protection of policy-holders and other creditors of the company until a fixed capital should be acquired, when the guarantee notes were to be surrendered.

ID.—NOTES PAYABLE AT OPTION OF COMPANY—EXCLUSION OF PRESUMED DEMAND.—Since the Insurance Act required the notes to be payable at the option of the company, and to be negotiable, it was proper, and in accordance with the intent of the act, that the notes should negative any presumption of a demand against the company or its indorsee by making each payable only after an actual demand.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. M. C. Sloss, Judge.

The facts are stated in the opinion of the court.

Vincent Neale, for Appellant.

Bishop, Wheeler & Hoefler, and William Rix, for Respondent.

LORIGAN, J.—This is an appeal from a judgment entered in favor of defendant after an order sustaining a demurrer to the complaint was entered.

The action is founded on a promissory note made by A. E. Head, against whom the action was originally commenced, but who having thereafter died, the respondent, as his administrator, was substituted as defendant.

It appears from the allegations of the complaint, necessary to be stated in order to discuss the point involved on this ap-

peal, that said note was executed by said A. E. Head on January 6, 1868, and is as follows:—

"OFFICE OF THE CALIFORNIA MUTUAL LIFE INSURANCE CO.

"$5,000            SAN FRANCISCO, January 6th, 1868.

"Five days after actual demand, for value received, I promise to pay to the order of the California Mutual Life Insurance Company the sum of five thousand dollars, in U. S. gold coin, with interest at the then legal rate from and after such demand.                     A. E. HEAD."

That upon its execution said note was delivered to the said California Mutual Life Insurance Company; that said California Mutual Life Insurance Company was incorporated in the year 1867 under an act of the legislature of the state of California entitled "An act to provide for the incorporation of mutual insurance companies for the insurance of life and health and against accidents," approved April 2, 1866; that in pursuance of the requirements of sections 8 and 9 of said act, the company had a capital stock fully paid up in cash of one hundred thousand dollars, and it also had a guarantee fund of two hundred and fifty thousand dollars, consisting of fifty promissory notes of solvent persons for five thousand dollars each, payable in five days after actual demand, to said company or its order; that said A. E. Head was one of such note-makers, and the note herein sued on was one of such guarantee notes; that all said notes were executed and delivered in pursuance to the provisions of said act; that after obtaining said guarantee fund the company commenced to prosecute the business of life insurance; that the net earnings of the company never accumulated in cash or securities in which the net earnings were invested to the sum of three hundred and fifty thousand dollars; that said company made no profits and never acquired any net earnings over the amount required for paying and providing for its expenses, losses, and liabilities; that said guarantee fund never became discharged of its obligations; that in 1885 said life-insurance company was declared insolvent, and upon proceedings had to that end it was by the court decreed, among other things, that said note of A. E. Head was an asset of said insolvent company, and directed it to be sold; that pursuant to said decree said note was sold to J. H. Dobinson, the agent of a syndicate of guarantee note-makers who co-

operated together to provide means to wind up said insurance
company and liquidate its indebtedness; that said note of said
Head was under direction of said syndicate transferred to the
executors of the estate of one .James Laidley., deceased, in set-
tlement and extinguishment of a claim of eight thousand four
hundred dollars against the said insolvent corporation by the
estate of said Laidley arising out of a policy of ten thousand
dollars issued by said insurance company payable on the death
of said Laidley; that on the twenty-second day of September,
1888, payment of said note was actually demanded of said
Head by the executors of said estate, and upon his refusal to
pay this action was commenced September 28, 1888, and is now
being prosecuted in behalf of said estate.

The defendant demurred to the complaint on the ground
that the cause of action of said note was barred by the
statute of limitations. The demurrer was sustained by the
superior court, and the validity of said order is the only
point presented on this appeal from the judgment.

This case was here on appeal before—*Neale* v. *Head,* 133
Cal. 42, [65 Pac. 131, 576]—after trial and judgment for
the plaintiff. On that appeal it was urged, among other
grounds for reversal, that the claim upon said note was barred
by the statute of limitations, but the case being reversed on
other grounds no disposition of that point was made. It is
claimed by respondent in support of the ruling of the lower
court that the general rule is, where a demand is necessary
to perfect a right of action upon a promissory note payable
on demand, and to set the statute of limitations in motion, that
such demand must be made within a reasonable time, which
in no event can exceed the statute of limitations provided
for bringing said action after the cause of action has ac-
crued, and that if such demand is delayed beyond that period
the right of action is forever barred. And applying the rule
to the note at bar, it is insisted that as such note provided for
payment "after demand" such demand should have been
made within the four-year period of limitation, and not hav-
ing been so made the cause of action upon the note was
barred when the complaint in this action was filed sixteen
years after the latest period for making such demand existed.
Conceding this to be the general rule, it has only been applied
in cases where the notes in question have been made payable

at a given period "after demand." We have been pointed to no authority which has held that this rule is applicable to notes payable within a certain period "after actual demand." In fact, our attention has not been directed to any case where the language used in the note before us has ever come up for consideration or interpretation. The general rule of limitations asserted by respondent as applicable to the note at bar is formulated by the decisions supporting it in cases where a note is payable so many days "after demand," upon a presumption from lapse of time that a demand was made. But certainly as a matter of simple contract the maker of a note could contract so that the maturity of his note payable so many days after demand should not be determined by presumption of law that a demand was made, but that it should only mature after actual demand—a demand in fact as contradistinguished from a presumptive one. And that this was the intention of the parties we think is apparent not only from the language used in the note, but from the situation of the contracting parties and the circumstances attending its making and delivery. It is a cardinal rule that in the interpretation of a contract every word used therein is to be given its full meaning and effect. And in the construction of a written instrument, in order to ascertain what was meant by the language used, the object in view and the circumstances surrounding the execution of the instrument are properly to be taken into consideration for that purpose.

Now, considering the situation and circumstances under which this note was executed. It was one of a number required to be given to the California Mutual Life Insurance Company in order to constitute a guarantee fund as required by the act under which the company was organized. It was given pursuant to the terms of the act, and the provisions of the act, in as far as they bear upon such note, must be considered as written into the note itself. (*Neale* v. *Head,* 133 Cal. 43-45, [65 Pac. 131, 576].)

Referring now to such provisions.

The act provided that every company formed under it should have a capital stock of not less than one hundred thousand dollars, was prohibited from making any insurance until said amount was fully paid up in cash, and until

after it should have obtained a fund to be known as the guarantee fund of not less than two hundred and fifty thousand dollars, consisting of the promissory notes of solvent persons approved by its board of directors and by each other note-giver; no note of any one person to exceed five thousand dollars.

Such notes were payable to the company, or its order, and at such time or times, in such modes and in such sums, and with or without interest, as the board of directors should prescribe. Such notes were to be payable absolutely, and at all events at the company's option, were negotiable and might be indorsed and transferred and converted into cash, or otherwise dealt with by the company at its discretion, without reference to any contingency of losses, expense, or otherwise. It was provided that such notes, or the proceeds thereof, should remain with the company as a fund for the better security of its dealers, should be assets of the company liable for all its debts, obligations, and indebtedness next after its assets from premiums and other sources, exclusive of capital stock, until the net earnings of the company, over and above its expenses, losses, and liabilities, should have accumulated, in cash or securities in which the net earnings had been invested, to a sum which, with the capital stock, would be equal to the original amounts of the guarantee fund and of the capital stock, and that thereupon the said sum of the capital stock should become and remain the fixed capital of the company, etc. It was further provided that when this fixed capital was attained all notes of the fund remaining in the company's control should be surrendered to the makers thereof, respectively, or other parties entitled to receive the same, but that until such time no guarantee note should be withdrawn from the fund unless another note of equal solvency should be substituted therefor, and not then unless with the unanimous approval of the board of directors then in office, and of all the other parties liable on the rest of the notes comprising the guarantee fund. It was also provided that the company should allow a commission of five per cent per annum on all such guarantee notes while outstanding, and also interest on all moneys paid on such notes by the parties liable thereon at the rate of twelve per cent per annum until repaid by the company.

As we say, it was under the provisions of this act, and for the purpose of assisting in creating the guarantee fund thereby required, that the note in controversy was given.

Now, we think it clear, when these provisions of the act are carefully considered, that if we assume, as is contended by counsel for respondent that the language of the note making it payable "after actual demand" is of no more legal force than if it had read simply "after demand," still, even so construing the note, the act itself provides within what time such demand may be exercised, which is at any time prior to the acquisition by the company of a fixed capital. This act is of equal dignity with the general statute of limitations. The legislature could have expressly provided that the time within which demand might be made on such guarantee notes might be at any time between the date of their execution and before a fixed capital was obtained by the company. It will not be pretended that in the face of such a provision in the act the statute of limitations which would ordinarily apply to notes payable at a given time "after demand" would apply to a note so payable given under the provisions of the act in question. But while the act contains no direct provision such as we have suggested might have been inserted in it, still it is obvious, when we consider the general scope and purpose of requiring these notes and the provisions relative to them, that this was what was contemplated and intended by providing that these guarantee notes should be payable at the option of the company. Under the act it was intended that these notes should constitute a continuing guarantee fund, which should remain intact for the protection of the policy-holders and other creditors of the company until a fixed capital was acquired, when the makers were to be relieved from responsibility and the notes surrendered. Until that time it was intended that the fund as represented by these notes (unless at the option of the company previous payment on them should be required) should constitute an inviolable fund to be resorted to when necessary to pay any claims payment of which they were executed to secure. There is nothing in the statute requiring the company to sue upon them every four years, nor any provision requiring that they should be renewed within that period. Under the act no duty is imposed upon the company to have them renewed—

replaced by new notes. On the contrary, as indicating that
the original notes, as far as any acts of the company are con-
cerned, shall at its option remain in the fund and under
the control of the company, it is expressly provided that
until a fixed capital is acquired no guarantee note shall be
withdrawn from such fund unless another note of equal sol-
vency shall be substituted therefor, and not then unless by
unanimous approval of the board of directors and all the other
parties liable on the rest of the notes in the fund. This pro-
vision evidently was intended to apply in cases where · a
guarantor of the fund desired to substitute another guarantor
in his place, and is the only way provided in which release.
prior to the acquirement of a fixed capital, could be obtained
by any guarantor from his continuing guarantee. In this re-
gard it may be suggested, too, that as the purpose to be at-
tained by requiring these guaranteed notes to be made was
to protect the policy-holders and other creditors until the
fixed capital was attained, this protection could be best af-
forded by providing that the notes should be a continuing
guarantee until that time, rather than to require them to
be renewed or sued on every four years, matters which the
directors of the company might, to the injury of the fund,
neglect to do. Neither could anything be attained by suing
upon these notes every four years. All that could be accom-
plished would be to convert good securities into cash, and
thereby substitute a guarantee cash fund for a guarantee-note
one. And this to the disadvantage of the company, because
while it was paying but five per cent commission per annum on
the notes under the act it would be paying under the same act
twelve per cent interest to the makers of them on the money
collected, and might so have to do for possibly many years be-
fore the guarantee fund would be required for any purpose, if
it would be required at all. The act certainly contemplated
nothing of this kind. In fact it contemplated that this guar-
antee-note fund might never be called on, and that it would
ultimately be relieved by the attainment of a fixed capital, at
which time the notes themselves would be surrendered. When
a fixed capital which would relieve these notes could be at-
tained would necessarily be problematical. It might be ac-
complished in a few years, or it might take many years to
do so, or it might not be achieved at all. It might also

take many years before any necessity would arise for calling on the guarantee fund at all. The liability of the company, considering the nature of its business, would principally be for death losses, any great number of which could not reasonably be anticipated for many years subsequent to the execution of these notes, or such as did occur might be paid from other resources of the company without calling on the guarantee-note fund. In contemplation of the uncertainty as to the time when this guarantee fund might be required, if at all, as it was to be created for the benefit mainly of policyholders whose claims might not accrue for many years, it was intended by the act that these guarantee notes should constitute a continuing guarantee fund, such notes to be payable at the option of the company, to be exercised at any time prior to the establishment of a fixed capital provided for in the act.

As these notes must be construed in the light of these provisions, it follows, as the act conferred upon the company the option of demanding payment of them at any time before a fixed capital was required, that when the note in question was executed providing for payment after demand, it was intended by the parties that such demand might be exercised by the company at any time prior to the acquirement of a fixed capital. The terms used in the note were inserted in harmony with the provisions of the act, so that the option there given to the company might be exercised at its pleasure at any time prior to that event.

In this regard the act, as the legislature had a right to provide, furnished its own provision when the statute of limitations should commence to run against these guarantee notes, which was after demand for payment made prior to obtaining such capital. Until such demand the statute of limitations could not operate.

Under this view, as the company had not acquired a fixed capital when demand was made on the note at bar, the statute of limitations had not run when this action was commenced.

Aside, however, from a consideration of the terms of the note, under the provisions of the act requiring its execution and declaring the purpose and effect thereof, we are satisfied that under the rule for interpreting contracts, which requires full force and effect to be given to every word used therein

with a view of determining the meaning and intention of the parties, the statute of limitations would not commence to run until demand in fact—an actual demand—was made for payment of the note.

It is claimed by respondent that the word "demand" implies itself an actual demand, and hence the word "actual" may be treated as redundant. Under this contention the word "actual" would have no meaning. It was, however, used by the parties, and we think sufficient reason is apparent why it was used, and used deliberately. It was used not only as characterizing the nature of the demand for payment which should be made, but as determining the time within which interest should begin to run upon the note, because it is provided therein that "five days after actual demand" the principal sum shall be paid, "with interest at the then legal rate from and after such demand." And it is readily perceivable why actual demand was provided for. The Insurance Act required these notes to be payable at the option of the company. It was further provided that these notes might be negotiated by the company; that it might indorse or discount them at any time that it saw fit to do so. When the form of notes to be given under the act was under consideration by the board of directors, it was doubtless then well understood that when a note was made payable simply "on demand" no demand need be made at all, and that the statute of limitations commenced to run from the date of the note; likewise that though a demand was necessary to protect a right of action on a note payable so many days "after demand," yet in order to bind an indorser of such note such demand must be made within a reasonable time; they knew also that as to the payee in such a note the rule contended for here by respondent would apply,—namely, that from the lapse of a reasonable time a demand would be presumed, such reasonable time usually being determined by the analogy of the statute of limitations.

With the knowledge of the law as applied to these forms of notes, the corporation doubtless wished to avoid its application by providing a different form. With this end in view the word "actual" was used. By using it both the maker and the payee intended that neither the rule that a note payable "on demand" was payable immediately, nor that to

bind an indorser on a note payable after demand the demand should be made within a reasonable time, should apply as to these notes. As the Insurance Act provided that these notes should be negotiable, it was intended to secure the freest negotiability at any time the company might desire to negotiate them. It was contemplated that at any time before a fixed capital was achieved they might be readily convertible into money. This ready negotiability could be best attained by making the notes payable at a given period after "actual demand," because as an indorser the company would then be liable to the holder until he chose to make actual demand for payment, without any question possibly arising as to whether the demand was or was not made within a reasonable time.

It was also intended by this form of note, requiring "actual demand," to prevent as to the payee the indulgence of any presumption of demand from lapse of time. In effect, by the use of the word "actual," as distinguished from the word "presumed," it was intended by the parties as to these notes that no presumption of demand having been made on it should be indulged in; that it was to be continuing security which would be unaffected by mere lapse of time before actual demand, and that it should not mature until actual demand for payment of it was made. Under these views the demand made for the payment of this note was in time, the statute of limitations was no bar to the action commenced on it, and the demurrer should have been overruled.

The judgment is reversed, with directions to the lower court to overrule the demurrer and allow the defendant to answer.

Henshaw, J., and McFarland, J., concurred.